IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | No.  4:05-CR-210 |
| | : | |
| | : | |
| | : | |
| v. | : | (Judge Jones) |
| | : | |
| MARKEIF FIELDS, JEROME | : | |
| GEORGE, and LEON GLASPIE, | : | |
| Defendants. | : | |

## MEMORANDUM AND ORDER

December 22, 2006

**THE BACKGROUND OF THIS ORDER IS AS FOLLOWS:**

Pending before the Court are various suppression motions filed by the above-named Defendants in this action.  The pending motions are as follows: Defendant Leon Glaspie's Motion to Suppress (doc. 49) filed on December 1, 2005; Defendant Jerome George's Motion to Suppress (doc. 66) filed on February 23, 2006; Defendant Leon Glaspie's Supplemental Suppression Motion (doc. 87) filed on March 17, 2006; Defendant Jerome George's Supplemental Suppression Motion (doc. 102) filed on April 4, 2006 and;  Defendant Leon Glaspie's Second Supplemental Motion to Suppress (doc. 109) filed on April 17, 2006.  By previous Order of Court dated October 10, 2006 we granted Defendant Markeif Fields' and Jerome Georges' individual Motions to join in their co-Defendant Leon Glaspie's

1

suppression motions.  (Rec. Doc. 242).

**<u>PROCEDURAL HISTORY</u>**:

A hearing was held on the pending motions on five separate days; May 22, 2006; May 31, 2006; June 12, 2006; July 18, 2006 and; August 9, 2006. Testimony was presented by the Government and the Defendants during the hearing.  Following the conclusion of the final hearing day, August 9, 2006, we entered an Order setting forth a post-hearing briefing schedule.  To date, the parties have complied with the briefing schedule.  Accordingly, the motions are fully briefed and therefore ripe for our review.

Since the conclusion of the suppression hearing, Defendants Glaspie and George have pled guilty, pursuant to negotiated plea agreements, to one count informations charging each with a violation of 18 U.S.C. § 371, conspiracy to commit an offense against the United States.  <u>See</u> <u>United States v. Glaspie</u>, 4:06-cr-343; <u>United States v. George</u>, 4:06-cr-344.  Within the plea agreements, the United States agrees to move for dismissal of the First Superseding Indictment in the above-captioned case as it pertains to Glaspie and George, in exchange for their respective pleas of guilty to violations of 18 U.S.C. § 371.

As a result, the only remaining defendant in this action who has not pled guilty and has standing to proceed on the suppression motions is Markeif Fields

2

("Fields").[1]  As Fields notes in his post-hearing submission, the legal principles

underpinning his suppression motion are narrower than Glaspie and George's.

Therefore the only issues that remain before the Court that were not mooted by

Glaspie and George's guilty pleas are the legality of the warrantless entry into

Apartment 1, 1920 Riverside Drive, South Williamsport, Pennsylvania on March

11, 2005 and whether probable cause supported the issuance of the search warrant

for the same residence on that same date.[2]

**FINDINGS OF FACT**:

On March 10, 2005, Lieutenant Thomas Ungard ("Lt. Ungard") of the

Williamsport Police Department, and a member of the Lycoming County Drug

Task Force, had a telephone conversation with a female Confidential Informant

("CI"), during which the CI advised Lt. Ungard of alleged drug dealing activities

of two African-American males occurring in the vicinity of 1920 Riverside Drive,

South Williamsport, Pennsylvania. (Hearing Transcript Volume I, p. 94-95; Vol. II,

p. 42).  The CI also advised Lt. Ungard that the names of the two males were

---

[1] Co-defendant Andre Spinks has previously agreed that he does not have standing to contest the search of Apartment 1, 1920 Riverside Drive, South Williamsport, Pennsylvania.

[2] Defendant George's Motion to Suppress (doc. 66), Defendant George's Supplemental Suppression Motion (doc. 102), and Defendant Glaspie's Supplemental Suppression Motion (doc. 87) and Second Supplemental Motion to Suppress (doc. 109) shall be dismissed as moot, due to their respective guilty pleas.  Defendant Glaspie's Motion to Suppress (doc. 49) is the only motion to survive because Fields was granted leave to join in that Motion.

Jerome and Leon Robinson, however, the CI informed Lt. Ungard that she believed these names were "bullshit." (Vol. I, p. 94; Vol. II pp. 42, 56). Lt. Ungard traveled to the area identified by the CI and also contacted Sergeant O'Connell of the South Williamsport Police Department to advise him of the information he received from the CI. (Vol. II, p. 26; Vol. V, p. 16).

On the following day, while on duty in the vicinity of the Third and Campbell Streets in Williamsport, Lt. Ungard and Officer Jeremy Brown[3] ("Officer Brown") observed an illegal drug transaction between Sharon Jencks, a crack-cocaine user known to the officers, and an unidentified African-American male. (Vol. I, pp. 6, 61, 96). The officers confronted Jencks, who admitted that she had just purchased crack-cocaine from Greg Cummings ("Cummings"). The officers thereafter located and arrested Cummings in the vicinity of 770 West Fourth Street, Williamsport, which was known to the officers as a drug activity area. (Vol. I, p. 62-63).

Immediately upon his arrest, Cummings displayed a willingness to cooperate. He accordingly indicated to the officers that he was concerned that individuals, who had exited a nearby barbershop and thus presumably had observed his arrest would tip off the individuals for whom he worked. Cummings

_____

[3] Officer Brown is also a member of the Lycoming County Drug Task Force.

4

requested to be moved around the corner and out of the view of these individuals. (Vol. I, 63-64, 98).  Officer Brown observed a black male, who "looked like a barber" talking on a cell phone.  (Vo. II, p. 65).  Cummings stated that did not know the man, but opined  that he knows "the guys I work for, he might be calling them now, he did know for sure."  (Vol. I, pp. 64, 99).  Cummings told the officers that based on this he assumed that there would be a "tip off" to his South Williamsport suppliers of his arrest.  (Vol. I, pp. 63-64, 98).  Cummings further told the officers that "if we wanted to get to the place, we needed to hurry up and move . . . word on the street is going to hit his employers, the defendants, that he was busted."  (Vol. II, pp. 65-66, 69).  The officers never questioned the individuals observed making telephone calls outside the barbershop, nor did Cummings identify those persons by name; he merely stated that the individuals "had contacts to those in the Southside,[4] and get me out of here."  (Vol. II. 23-24). Notably, the individuals were never questioned by the officers, nor were they identified.

Uniformed officers transported Cummings to Williamsport City Hall, where he was interrogated.  During interrogation, he continued to assert that his suppliers in Southside might have been tipped off about his arrest by the on-lookers who

_____

[4] The term "Soutside" refers to South Williamsport, Pennsylvania.

were talking on their cellular phones, and told the officers to go now or otherwise the evidence would be cleaned up, removed or destroyed.  (Vol. II, p. 91). Cummings told the officers that he obtained the cocaine the night before at the apartment in South Williamsport from black males named Jerome and Keith.  (Vol. II, p. 66).

Approximately fifteen to twenty minutes after arriving at Williamsport City Hall with Cummings, Lt. Ungard left and traveled to the vicinity of 1920 Riverside Drive.  (Vol. I, 106-107).  When Lt. Ungard arrived, he positioned himself so that he could observe the entry/exit street door leading into 1920 Riverside Drive. (Vol. I, p. 114).  While Lt. Ungard was conducting this surveillance, he was aware that the Cummings' alleged sources were African-American males who lived in the apartment building with a Caucasian female.   Lt. Ungard observed an African-American male exit 1920 Riverside Drive, and was concerned that the black male was leaving the scene with drugs.  Lt. Ungard also observed an African-American male enter the residence and a Caucasian female exit. (Vol. I, p. 113-114).  Lt. Unguard made no attempt to detain or follow the exiting individuals.  (Vol. I, p. 110-112).

While Lt. Ungard was conducting surveillance of the 1920 Riverside Drive location, Officer Dustin Kreitz ("Officer Kreitz") of the Williamsport Police

Department and Lycoming County Drug Task Force was in the process of

assembling an entry team, as directed by Lt. Ungard.  Based upon his surveillance,

Lt. Ungard called Officer Kreitz and told him to speed up the process of

assembling the entry team. (Vol. I, p. 114).  Lt. Ungard also advised Officer

Damon Hagan ("Officer Hagan") of the Williamsport Police Department and

Lycoming County Drug Task Force of Lt. Ungard's plan to make entry into

Apartment 1, 1920 Riverside Drive, detain any individuals inside, and then apply

for a search warrant.  (Vol. III, p. 20).  Officer Hagan was told that "exigent

circumstances" were present necessitating warrantless entry into the residence to

prevent possible evidence destruction. (Vol. I, p. 114).  Prior to the entry, Lt.

Ungard also advised Sergeant Terrence O'Connell ("Sgt. O'Connell") of the South

Williamsport Police Department that he was concerned the occupants of Apartment

1, 1920 Riverside Drive had been tipped off and that evidence would be removed

or destroyed.   (Vol. V, p. 20; Vol. I, p. 117).

Ultimately, the entry team assembled at 1920 Riverside Drive with entry

equipment, including a door ram, approximately one and a half hours after

Cummings had been arrested.  (Vol. 1, p. 117).  The team entered the building

through the street door and went up the narrow staircase to Apartment 1.  (Vol. I, p.

117).  With the ramming device in hand, Lt. Ungard knocked twice on the

apartment door, announced "police," and heard physical movement in the apartment.  (Vol. I, pp. 69, 119, 121).  A male voice asked "who is it" after the first knock and sounded as if he was "hurry[ing] away."  (Vol. I, p. 69).  A female voice responded "who is it" to the second knock without hurrying away.  (Vol. I, p. 69).

Lt. Ungard broke through the door with the ramming device. (Vol. I, p. 69, 120).  Simultaneous to the officers' entry, apartment occupant Sophia Moyle ("Moyle") unlocked the door, which is how the door was ultimately opened, and the officers gained access to Apartment 1.  (Vol. I, p. 72, 120).  The entry team entered the apartment with weapons drawn, dispersed to the various rooms within, and ordered the occupants to get down on the ground.  (Vol. I, pp. 72-73, 121-122).  The officers handcuffed the occupants behind their backs and searched them.  (Vol. I, 121-122).

In the search of the apartment, a baggie containing suspected marijuana was found in the immediate physical proximity of an individual named Devin Hockaday ("Hockaday").  When questioned about the suspected marijuana, Hockaday told the police that it belonged to him.  During the search of Hockaday's person, officers found a sum of $403.00 in cash on him.  (Vol. II, p. 75; Vol. I, p. 75; Vol. V, p. 44).

During the initial entry, Lt. Ungard found a safe in a bedroom closet with

8

clothes strewn on top of it.  (Vol. I, p. 126).  Lt. Ungard testified that he did not

move the save or try the lock until after the search warrant was obtained, at which

point he removed it from the closet.  (Vol. 1, pp. 77, 126).  Officer Finnerty and

Sgt. O'Connell, however, contradicted Lt. Ungard's testimony, testifying that they

observed the safe on the dining room table, and that St. O'Connell photographed it

in that position prior to the search warrant being obtained.  (Vol. I, p. 30-31; Vol.

V, p. 22; Government Exhibit 20.2).  A key that had been seized from Glaspie's

person was in the lock of the safe when St. O'Connell first photographed it. (Vol.

V, p. 34, Gov't Ex. 20.2).

Officers transported the suspects from the apartment to police headquarters

after the entry.  Lt. Ungard designated Officer Kreitz to secure, and be the affiant

for, a search warrant.  (Vol. I, p. 34).  The warrant was signed and sealed at 8:20

p.m.  (Vol. V, p. 112).

The affidavit states that on March 11, 2003, Confidential Informant #04-26

contacted the Lycoming County Drug Task Force and advised officers that "she

could and has been regularly purchasing cocaine in the 1900 block of Riverside Dr.

From two individuals who identified themselves as Jerome and Keith."  (Gov't Ex.

3 at 1).  However, as previously noted, Lt. Ungard testified that CI #04-26 told him

the individuals selling narcotics at that location were named "Leon Robinson and

Jerome George."

The affidavit describes the encounter with Jencks and Cummings, but does not disclose the urgency conveyed to the officers regarding the imminent destruction of evidence from 1920 Riverside Drive based upon the observation of his arrest.  The affidavit states that "Cummings advised officers that he was given the cocaine the night before inside 1920 Riverside Drive, Apt. #1 in South Williamsport by an individual who identified himself as Keith."  (Gov't Ex. 3 at p.2).

> With respect to the entry to Apartment 1, the affidavit states that:
>
> Officers traveled to 1920 Riverside Dr., Apt. #1 and made contact with the resident, Sophia Moyle.  Inside the apartment officers made contact with individuals who identified themselves as Leon Glaspie, Jerome George, and Devin Hockaday.  They all gave officers consent to search their persons.  Glaspie had a safe key on his person.  Glaspie also advised officers that he had placed marijuana inside the safe. Also inside the apartment, officers observed a safe, suspected marijuana, and a large amount of U.S. Currency lying in . . . plain view.

(Gov't Ex. 3 at p.2).

## **DISCUSSION**:

Due to the procedural posture of this case, namely the entry of guilty pleas by both Glaspie and George, Defendant Fields argues that these issues only remain for our consideration: first, whether exigent circumstances supported the

warrantless entry into Apartment 1, 1920 Riverside Drive and second, whether the issued search warrant was based upon probable cause.

As a threshold matter, it is important to note that Fields has standing to challenge the search of Apartment 1, 1920 Riverside Drive.  "Standing to challenge a search requires that the individual challenging the search have a reasonable expectation of privacy in the property searched . . . and that he manifest a subjective expectation of privacy in the property searched."  United States v. Baker, 221, F.3d 438, 441 (3d Cir. 2000)(citations omitted).  It is uncontested that Fields was a resident of Apartment 1, 1920 Riverside Drive, and it is therefore axiomatic that he  had an expectation of privacy therein.

### A.   Exigent Circumstances

The governing jurisprudence of the Fourth Amendment to the United States Constitution is the logical starting point in our analysis of the warrantless entry to Apartment 1, 1920 Riverside Drive, South Williamsport, Pennsylvania.  The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized.

U.S. Const. amend IV.   It is well established that, absent an exception, warrantless

searches and seizures inside an individual's home are prohibited and presumptively

unreasonable. See Payton v. New York, 445 U.S. 573 (1980); Johnson v. United

States, 333 U.S. 10 (1914).

The Supreme Court has "emphasized that exceptions to the warrant

requirement are 'few in number and carefully delineated,' . . . and that the police

bear a heavy burden when attempting to demonstrate an urgent need that might

justify warrantless searches."  Welsh v. Wisconsin, 466 U.S. 740-749-750

(1984)(quoting United States v. United States District Court, 407 U.S. 297, 318

(1972)).  "[T]he informed and deliberate determinations of magistrates empowered

to issue warrants as to what searches and seizures are permissible under the

Constitution are to be preferred over the hurried action of officers and others who

may happen to make arrests."  United States v. Johnson, 68 S. Ct. 367, 369 (1948).

A recognized exception to the warrant requirement that is relevant to our

inquiry in this matter is that of exigent circumstances.   Pursuant to the exigent

circumstances exception, warrantless searches and seizures inside the home are

presumptively unreasonable *unless* probable cause *and* exigent circumstance exist

to justify the intrusion.  See Steagald v. United States, 451 U.S. 204, 211 (1981);

Payton v. New York, 445 U.S. 573, 586 (1980); see also United States v. Rubin,

474 F.2d 262, 268 (3d Cir. 1973)("Probable cause to believe contraband is present

is necessary to justify a warrantless search, but it alone is not sufficient . . . Mere probable cause does not provide the exigent circumstances necessary to justify a search without a warrant.").

The familiar hallmarks of exigent circumstances are hot pursuit, possibility that evidence may be removed or destroyed, and danger to the lives of officers or others.  See United States v. Richard, 994 F.2d 244, 247-248 (5th Cir. 1993); see also Rubin, 474 F.2d at 268-269.  "In these limited situations, the need for effective law enforcement trumps the right of privacy and the requirement of a search warrant, thereby excusing an otherwise unconstitutional intrusion."  United States v. Coles, 437 F.3d 361, 366 (2006)(citing Warden v. Hayden, 387 U.S. 294, 298-299 (1967)).  The judging of the legality of warrantless searches involves "a delicate questioning of balancing the rights of the individual to be secure in his home against the interest of society in preventing the disappearance of evidence necessary to convict criminals."  Rubin, 994 F. 2d at 268.

In Rubin, the Court of Appeals for the Third Circuit identified various factors for courts to consider when determining whether a warrantless search was justified by exigent circumstances, and this framework continues to be utilized by the Third Circuit to date.  These factors include:

(1)     the degree of urgency involved and the amount of time necessary to obtain a warrant;

(2)     reasonable belief that the contraband is about to be removed;

(3)     the possibility of danger to police officers guarding the site of the contraband while a search warrant is sought;

(4)     information indicating the possessors of the contraband are aware that the police are on their trail;

(5)     the ready destructibility of the contraband and the knowledge "that efforts to dispose of narcotics and to escape are characteristic behavior of persons engaged in narcotics traffic."

<u>United States v. Ingram</u>, 2006 U.S. App. LEXIS 29221, *10 (3d Cir. 2006)(internal citations omitted).  With these factors in mind, we turn to an analysis of the factual panoply in this case.

The Government asserts that the basis for exigent circumstances formed upon the arrest of Cummings and the information he subsequently proffered to the officers at that point. We accept that Cummings told the officers to "get him out of here" and that he speculated that the individuals observed down the street, some of whom may have been talking on cellular phones, knew his employers in South Williamsport.  However, Cummings was admittedly unknown to the officers, as were the individuals down the street, and therefore the officers had no way of knowing whether Cummings was credible or reliable in his assertion that his employers were being "tipped off."  Moreover, the officers did not endeavor to engage the witnessing individuals in a discussion to corroborate Cummings'

14

assertions to them.  In fact, Cummings was acting in accordance with the way many arrested drug dealers do; he was attempting to give the officers some information in the hopes that they would grant him consideration regarding his arrest.   These experienced officers were, or should have been, well aware that upon his arrest, Cummings' priorities were those of self-interest and self-preservation, and with cognizance of Cummings' motivation, the officers should have proceeded with some caution upon any information proffered by Cummings. We find that there is no credible evidence that tends to show that the occupants of Apartment 1, 1920 Riverside Drive were aware that the police were on their trail. Any assertion in that regard involves rank speculation.  Cummings' suppositions could have been checked out by the officers, but they were not. Therefore, as a corollary, we cannot find, based upon Cummings' assertions alone, that the officers had a reasonable belief that contraband was being removed or secreted.

Next and importantly, the actions of the officers following the arrest of Cummings do not indicate to the Court that they wholly believed it was urgent to enter Apartment 1, 1920 Riverside Drive to preserve evidence.  Lt. Ungard did not immediately travel to the vicinity of 1920 Riverside Drive upon Cummings' arrest, but rather accompanied him back to Williamsport City Hall.  Thereafter, Lt. Ungard proceeded to 1920 Riverside Drive and commenced surveillance.  He then

observed individuals who fit the description of the suspected residents of Apartment 1 enter and leave the apartment building, however he made no attempt to question or follow these individuals.  This is somewhat remarkable, in that Lt. Ungard testified that he was concerned these individuals were leaving with evidence.  Further it is clear that Lt. Ungard and other officers were safely able to obtain surveillance positions, and there was no evident danger to the officers if they continued to maintain surveillance while a warrant was being sought.

After a searching review of the facts we are left with the inescapable conclusion that there existed *no* affirmative evidence that destruction of evidence was imminent, simply because no evidence indicated that the occupants of Apartment 1, 1920 Riverside Drive were aware of Cummings' arrest or his accusations against them.  Instead what we find is apparent *post hoc* reasoning by the Government that attempts to wedge this warrantless entry into a recognized exception to the warrant requirement. Essentially the Government is asking this Court to cure a conundrum of its own making by buying into an artificial construct of both exigent circumstances and probable cause, which we plainly cannot do.

Finally, we will also point out that the officers clearly did not believe that the information from CI #04-26 and Gregory Cummings standing alone provided a sufficient basis to create probable cause to support the issuance of a search warrant,

16

or the sequence of their actions would have been wholly different.  This is significant and telling.  It compels us to call this case what it is: a clumsy attempt to circumvent the requirement of a search warrant that resulted from an inability to muster facts in support of a probable cause affidavit.

Accordingly, because we find no evidence of exigent circumstances, the entry into Apartment 1, 1920 Riverside Drive is necessarily unlawful and violative of the Fourth Amendment to the United States Constitution.  The result of our holding is that we shall suppress all of the physical evidence searched and seized from Apartment 1, 1920 Riverside Drive.

### B.   Validity of the Search Warrant

The second issue Defendant Fields raises  for our consideration is whether the search warrant issued on March 11, 2005 was properly supported by probable cause.  The Defendant alleges that the warrant was improperly issued because it was based upon false statements and omissions in the affidavit of probable cause.

The seminal case that established a defendant's right to overcome the presumption of the validity of a search warrant and challenge the issuance of a search warrant is Franks v. Delaware, 438 U.S. 154 (1978).  In Franks, the majority of the Supreme Court held that where a defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless

disregard for the truth, was included by an affiant in his affidavit for a search

warrant, and if the alleged false statement was necessary to the finding of probable

cause, the Fourth Amendment requires that a hearing be held so that the defendant

may challenge the truthfulness of the factual statements made in the affidavits.  If,

at such a hearing, the defendant establishes by a preponderance of the evidence

that: (1) the affiant knowingly and deliberately, or with a reckless disregard for the

truth, made false statements or omissions that create a falsehood in applying for a

warrant; and (2) that such statements or omissions were material, or necessary, to

the probable cause determination, then the affidavit's false material set to one side.

If the affidavit's remaining content is insufficient to establish probable cause, the

search warrant is voided and the fruits of the search excluded to the same extent as

if probable cause was lacking on the fact of the affidavit.  <u>Franks</u>, 438 U.S. at 171-

172.

     The first step in the <u>Franks</u> analysis is to identify false information contained

in the affidavit, as well as take into consideration material omissions or distortions.

<u>Wilson v. Russo</u>, 212 F.3d 781, 787-88 (3d Cir. 2000).  With respect to false

statements, the Third Circuit hsa defined such assertions in this manner, "we have

borrowed from the free speech arena and equated reckless disregard for the truth

with a 'high degree of awareness of [the statements'] probable falsity." <u>Id</u>.

Regarding omissions, the Third Circuit has explained such " are made with reckless disregard if an officer withholds a fact in his ken that 'any reasonable person would have known that this was the kind of thing the judge would wish to know.'" Id. at 788.

The affidavit of probable cause contains numerous statements that are false *on their face*.  We shall discuss each of the four notably false statements in turn. They are:

(1) That CI #04-26 told Lt. Ungard the names of the individuals from whom she purchased crack in South Williamsport were "Jerome and Keith."  In fact, the names given to Lt. Ungard by CI #04-26 were "Jerome and Leon Robinson." At first blush, we could interpret the affiant's inclusion of the name "Keith" instead of "Leon Robinson," as an innocent mistake.  However, when viewed in conjunction with the facts, the name substitution seems entirely purposeful.  Cummings had told the officers that the names of his suppliers in South Williamsport were Jerome and Keith.  Therefore, by representing to the magistrate that a CI, seemingly independent of Cummings, provided the same two names as Cummings had and also associated those individuals with drug dealing in South Williamsport, the affidavit becomes distinctly stronger since *both* names – not just one – match up. A continued reading of the affidavit reveals the following false statements, which

also indicate to us that the name switch was not an innocent mistake.

(2) That officers "made contact" with resident Sophia Moyle upon arriving at Apartment 1, 1920 Riverside Drive.  In fact, the officers first blew through the door of the apartment with a battering ram, and only after that did Moyle unlock the door for their entry.  The affiant represented to the magistrate that their contact with Moyle was somehow passive, consensual or even happenstance, when in fact the affiant knew that the contact made with Moyle resulted from a battering ram being forced through her front door.  It is axiomatic that "made contact" is not a euphemism for smashing in a door, and this benign statement is an attempt to gloss over the circumstances that give rise to the initial contact.

(3) That the individuals inside the apartment consented to a search of their persons.  In fact, the individuals were ordered onto the floor by the officers, who had their weapons drawn, and then were handcuffed.  In no way can a search of their persons be deemed consensual.  This is an affirmative misrepresentation by the affiant.

(4) That the officers observed "a large amount of U.S. Currency lying . . . in plain view."  In fact, an amount of $403.00 in cash was seized from the person of Devin Hockaday. In no reasonable way could it have been described as lying in plain view.  This is yet another misrepresentation of the facts.

20

It is abundantly clear that when the facts of this case as adduced at the hearing are examined against the backdrop of the affidavit of probable cause submitted by Officer Kreitz,  the result is that the affidavit contains false statements that are entirely material.  Officer Kreitz, a member of the entry team into the apartment, was fully aware of what occurred inside Apartment 1, 1920 Riverside Drive.  Accordingly, on this record we can only conclude that the false statements made by Officer Kreitz in the affidavit were made, at worst, knowingly and intentionally, and, at best, with reckless disregard for the truth.

As <u>Franks</u> directs, the next step in our analysis is to excise the false statements from the affidavit and step into the shoes of the magistrate judge, thereby making a determination whether probable cause exists to support the issuance of a warrant based upon the information that remains. What we are left with is (1) an uncorroborated statement from an unidentified CI that she purchased cocaine in the 1900 block of Riverside Drive and (2) a statement from Cummings, made upon his arrest, indicating that he was given cocaine the night before in the apartment and was instructed to sell the drugs.

Probable cause is a "practical, nontechnical conception . . . [it] is a fluid concept – turning on the assessment of probabilities in particular factual contexts – not readily, or even usefully, reduced to a neat set of legal rules." <u>Illinois v. Gates</u>,

21

462 U.S. 213, 231-232 (1983).  The Supreme Court has instructed that with respect to unidentified informants, a "practical, common-sense decision" is to be made by the magistrate, "whether given all the circumstances set forth in the affidavit . . . including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." Id. at 239.

When the tainted portion of the affidavit is excised, what remains are bare assertions made by a CI and Cummings, a drug dealer previously unknown to the officers.  The affiant does not, in any way, vouch for the credibility or veracity of the CI.  With respect to Cummings, the affiant describes the witnessed drug transaction within the affidavit, but cannot, and does not, have a basis to determine Cummings' credibility.  Moreover, the information given by the CI and Cummings are not married when the false statements are excised, but only loosely linked.

Applying good common-sense to the facts that remain, we cannot find, nor do we believe a magistrate would have found, a "fair probability [existed] that contraband or evidence of a crime" would have been found at Apartment 1, 1920 Riverside Drive.  Moreover, if the magistrate, as we are,  had been apprised of what was omitted from the affidavit – the warrantless, forced entry – the facts take on an entirely different tack.  With the entire factual record now before us, we

cannot prudently find that probable cause existed to support the warrant.

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT:**

1.  The Motion to Suppress (doc. 49) is GRANTED in part to the following extent:

    a.  All physical evidence searched and seized from Apartment 1, 1920 Riverside Drive, South Williamsport, Pennsylvania that is attributable to Defendant Fields is SUPPRESSED.

2.  Defendant Jerome George's Motion to Suppress (doc. 66) is DENIED as MOOT for the reasons stated herein.

3.  Defendant Leon Glaspie's Supplemental Suppression Motion (doc. 87) is DENIED as MOOT for the reasons stated herein.

4.  Defendant Jerome George's Supplemental Suppression Motion (doc.102) is DENIED as MOOT for the reasons stated herein.

5.  Defendant Leon Glaspie's Second Supplemental Motion to Suppress (doc. 109) is DENIED as MOOT for the reasons stated herein.

s/ John E. Jones III
John E. Jones III
United States District Judge